UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GENERAL RE LIFE CORPORATION,
    Plaintiff,

    v.

LINCOLN NATIONAL LIFE INSURANCE
COMPANY,
    Defendant.

No. 15-cv-1860 (VAB)

**RULING AND ORDER**

Pending before the Court is (1) General Re Life Corporation's ("General Re" or "Gen Re") Petition to Confirm the Final Arbitration Award and Vacate the Arbitrators' Purported Clarification of the Final Award (the "Petition"), ECF No. 1, (2) Lincoln National Life Insurance Company's ("Lincoln") Cross-Petition to Confirm Arbitration Award as Clarified (the "Cross-Petition"), ECF No. 21; ECF No. 22, and (3) Lincoln's Motion to Enter Judgment (the "Motion"), ECF No. 45; ECF No. 46.

For the reasons that follow, the Petition is **DENIED**, the Cross-Petition is **GRANTED**, and the Motion is **GRANTED**.

I.    **BACKGROUND**

General Re entered into an Automatic Self-Administered YRT Reinsurance Agreement (the "Agreement" or the "Treaty") with Lincoln effective January 1, 2002. *See* Treaty, ECF No. 7-1. Under the Agreement, General Re reinsured a portion of various individual life insurance products issued by Lincoln and also had a unilateral right to increase the reinsurance premiums so long as the new rates were based solely on a change in anticipated mortality. Treaty, Ex. C-1, ¶ 7. In the event that General Re exercised its right to raise rates, however, the Agreement

allowed Lincoln to "recapture" its life insurance policies, *i.e.*, to terminate the reinsurance going forward rather than pay the increased premiums.  *Id.*  The Agreement did not provide a specific methodology for implementing this right of recapture.  Exhibit F of the Agreement did provide, under "Remittance Reporting," that Lincoln "will take credit, without interest, for any unearned premiums arising due to reductions, cancellations or death claims."  Treaty, Ex. F.

In March 2014, General Re exercised its right to increase the reinsurance rates effective April 1, 2014.  *See* 6/4/2014 Letter, ECF No. 7-2 (noting that General Re had sent a letter on March 28, 2014 regarding a rate increase).  In response, on June 4, 2014, Lincoln demanded arbitration.  *Id.*

The dispute was submitted to a panel of three arbitrators.  A hearing before the arbitrators began on June 15, 2015.  *See* 6/15/2015 Hearing Trans., ECF No. 7-8.  During the hearing, the parties devoted very little time to discussing the terms of recapture.[1]  *See generally* Full Hearing Trans., ECF No. 22-3.  On July 1, 2015, a majority of the arbitrators issued the Final Arbitration Award (the "Final Award").  On November 19, 2015, a different majority issued the Clarification of Final Arbitration Award (the "Clarification").

A.     **The Final Award**

Umpire Barbara Niehus and Arbitrator Denis Loring signed the Final Award.  Arbitrator Thomas Zurek dissented.  *See* Final Award, ECF No. 7-13.  Niehus and Loring concluded that there had been a change in anticipated mortality, and that General Re was therefore entitled to a rate increase.  *Id.* ¶ 2.  If Lincoln elected to recapture in the event of a rate increase, the Final

---

[1] The vast majority of the hearing was devoted to the core issue in the dispute, the question of whether there had been a change in anticipated mortality and whether General Re was, therefore, entitled to a rate increase.  The parties' discussion of how recapture would proceed was limited to brief comments repeating what little information on the subject was included in the parties' pre-hearing briefs and proposed awards. *See* Full Hearing Trans. 1248:3-8, 1248:25-1249:15, 1255:22-1256:16.

Award provided that this recapture would be effective retroactive to April 1, 2014.  *Id.* ¶ 6.a.

The Final Award further provided the following:

> The Panel finds that, since Lincoln demanded arbitration in June 2014, the parties have continued to administer the reinsured business under the original Treaty terms. The Panel further finds that General Re has incurred expenses and capital costs associated with the reinsured business during that time.   Therefore, if Lincoln recaptures the reinsured business, the Panel orders that the following shall occur:
>
> i.   All premium and claim transactions paid by one party to the other following the effective date of the recapture (*i.e.*, from April 1, 2014) shall be unwound.
>
> ii.   Lincoln shall reimburse General Re for the expenses and cost of capital that General Re incurred in providing reinsurance to Lincoln since that date.  The Panel finds that the single life expense assumption of 5% of premium used in General Re's original Treaty pricing . . . shall be applied to all premiums that would have been paid by Lincoln based on the original Treaty premium rates.
>
> iii.   The Parties shall promptly work together to agree upon the amount of premium and claims to be unwound, and the expenses associated with the administration of the reinsured business.   Any disagreement over the calculations shall promptly be submitted to the Panel for resolution pursuant to ¶ 9, below.   The party with the net balance owing shall remit its payment to the other party within 90 days of this Award.

*Id.* ¶ 6.b.[2]

The Final Award then ordered that "[a]ll other requests for relief from the parties are denied," *id.* ¶ 8, and that "[t]he Panel shall retain jurisdiction over this matter to the extent necessary to resolve any dispute over the calculation and payment of the amounts awarded herein," *id.* ¶ 9.  This retention of jurisdiction would "extend until either (i) the date on which Lincoln pays General Re the amounts ordered in ¶ 5 [the "Payment of Premium" section] of this Award, or (ii) the date on which Lincoln recaptures the business reinsured under the Treaty and all associated balances due are paid, as provided in ¶ 6 of this Award."  *Id.*

---

[2] Zurek explicitly dissented from this portion of the Final Award.  *See* ECF No. 7-14 at 2.  However, Zurek's dissent discusses only his analysis of the change in anticipated mortality issue, and does not touch upon recapture at all.

Paragraph 6.b.i. of the Final Award adopted the language regarding recapture that General Re had proposed to the arbitrators.  *See* Gen Re Proposed Final Arbitration Award ¶ 6.b.i., ECF No. 7-10; *see also* Gen Re Pre-Hearing Br. at 34, ECF No. 7-4; Gen Re Opening Statement PPT at 46, ECF No. 7-6; Gen Re Closing Statement PPT at 142, ECF No. 7-7. Because Lincoln's position was that General Re's rate increase was improper, Lincoln's submissions to the arbitrators contained very little discussion of proposed terms for recapture.[3] *See* Lincoln Pre-Hearing Br. at 21, ECF No. 7-5 (discussing recapture only to the extent of arguing that "no provision in the Treaty . . . requires notice within 30 days" if Lincoln exercises right to recapture "and no provision in the Treaty . . . imposes the conditions on recapture that Gen Re requests the Panel declare").  Lincoln's proposed award did not, therefore, contain any language regarding how recapture should proceed.  *See generally* Lincoln Proposed Final Award, ECF No. 7-11.

## B.    Recapture Dispute

Following the arbitrators' issuance of the Final Award, Lincoln and General Re communicated by e-mail regarding how to calculate the recapture payments under the Final Award, should Lincoln invoke its right to recapture.  *See generally* Recapture E-mails, 10/26/2015 Letter Ex. B, ECF No. 7-16.  The parties differed in their interpretation of the methodology for calculating the recapture payments.  *Id.* at 1-7.  General Re believed that paragraph 6.b.i. of the Final Award required "reversing all cash transactions" from the April 1, 2014 effective date of recapture.  *Id.* at 6.  Lincoln believed a "recapture effective 4/1/14" meant that Lincoln would "pay back all claims with dates of 4/1/14 and later"; "Gen Re would return premiums paid prior to 4/1/14, but unearned as of 4/1/14" to Lincoln; and "Gen Re would return

---

[3] Under the terms of the Treaty, Lincoln would only have the right to "recapture" the life insurance policies if General Re raised rates due to a change in anticipated mortality.  Treaty, Ex. C-1, ¶ 7.

all premiums paid for other coverage 4/1/14 and later." *Id.* at 7.  Lincoln also argued that General Re's calculations improperly "use[d] all claim payments made 4/1/14 and later regardless of date of death," while Lincoln "only use[d] claims where the [date of death] was after the recapture effective date," believing that General Re remained "responsible for all claims prior to this date." *Id.* at 4.  General Re's methodology and calculations indicated that General Re owed Lincoln $5,484,106.[4]  *Id.* at 6.  Lincoln's position was that General Re actually owed Lincoln approximately $18.5 million[5].  *See* Lincoln Spreadsheet, 10/26/2015 Letter Ex. A, ECF No. 7-16.

On September 28, 2015, Lincoln formally notified General Re by email that Lincoln was invoking its right to recapture.  Recapture E-mails at 5.  The parties continued to communicate by e-mail regarding their differing interpretations of the amount of recapture payments that were required under the Final Award.  *Id.* at 1-5.

In a letter dated October 13, 2015, General Re notified Lincoln that it would be remitting to Lincoln $5,484,106, claiming that this amount  represented the net recapture balance, based on all premium and claim payments that had been made between the parties from April 1, 2014.

---

[4] According to General Re's calculations, the $5,484,106 represented a total of:

| | |
|---|---|
| Return premium paid 4/1/2014 – 9/3/2015: | ($32,901,297) |
| Reimbursement for expenses and cost of capital: | $1,645,065 |
| Reimbursement for claims (incl int) paid 4/1/2014 – 9/3/2015 | $34,472,126 |
| Return payment of estimated additional premium less experience refund | ($8,700,000) |
| **Total Payment from/(to) Lincoln:** | **($5,484,106)** |

[5] According to Lincoln, an estimate of the roughly $18.5 million that General Re owed it represented a total of:

| | |
|---|---|
| Result of General Re's Calculation | $5,484,106 |
| Premiums General Re received prior to 4/1/14 but unearned as of 4/1/14 | $9,985,906 |
| Claims incurred prior to 4/1/14 but reported or paid after 4/1/14 | $8,532,220 |
| Difference in cost of capital calculation due to differing premium base | $78,961 |
| Premium payments made on 4/1/14 (typically covering March renewals) | ($1,238,632) |
| Premiums paid 4/1/14 or later to reconcile earlier coverage periods | ($359,319) |
| Claims pending but unpaid as of 8/31/15 | ($3,809,002) |
| **Total Payment to/(from) Lincoln:** | **$18,664,180** |

*See* 10/13/2015 Letter, ECF No. 7-16.  Lincoln accepted without reservation the promised wire

transfer on October 15, 2015.  *See* Gen Re Br. at 8, ECF No. 7.

    **C.**    **The Clarification**

    On October 26, 2015, Lincoln submitted a letter to the arbitrators asking them to resolve

a dispute between the parties as to how to read paragraph 6.b.i. of the Final Award.  *See*

10/26/2015 Letter, ECF No. 7-15.  Lincoln's letter reiterated the position that it had taken in its

communications with General Re that General Re's proposed calculation should be adjusted by:

"returning to Lincoln the unearned portion of premiums paid prior to April 1, 2014"; "paying to

Lincoln claims with a date of death prior to April 1, 2014"; and "removing from the calculation

those premiums paid or on subsequent to April 1, 2014 but relating to prior coverage periods."

*Id.* at 3.

    In support of its argument, Lincoln referred to Exhibit F of the Treaty, which provided

that Lincoln "will take credit, without interest, for any unearned premiums arising due to

reductions, cancellations, or death claims."  *Id.* at 5.  Lincoln also argued that the Final Award

had retained the arbitrators' jurisdiction to resolve disagreements over the calculation of the

recapture payments and that the current dispute was one regarding whether the Final Award

"compels the recapture calculation that Gen Re asserts is required."  *Id.* at 7.

    On November 4, 2015, General Re submitted its objection to the arbitrators.  11/4/2015

Letter, ECF No. 7-17.  General Re argued that Lincoln's request was beyond the authority of the

arbitrators because it sought reconsideration of and a fundamental change to the recapture

methodology unambiguously ordered in the Final Award.  *Id.* at 6-10.

On November 19, 2015, Niehus and Zurek signed the Clarification, from which Loring dissented.  Clarification, ECF No. 7-19. Zurek had not been a signatory of the Final Award, while Loring had been.  Clarification Dissent, ECF No. 7-20.

The Clarification stated that the Final Award contained "ambiguities requiring clarification," Clarification at 1, ECF No. 7-19.  The Clarification concluded that both Lincoln and General Re were reading paragraph 6.b.i. of the Final Award in a manner inconsistent with the language of the Treaty, and that paragraph 6.b.i. "is not intended to and does not change the terms of the Treaty."  *Id.* at 2.

The Clarification provided, in relevant part, that "[w]hen read in the context of recapture under the Treaty, paragraph 6.b.i only deals with prospective unwinding of premiums and claims transactions beginning April 1, 2014," and "when read in context of the Treaty, Paragraph 6bi entitles Gen Re to retain the unearned premium it held as of the date of recapture."  Clarification. at 2, ECF No. 7-10.  The Clarification further provided that:

> When read in context of the Treaty, Paragraph 6bi requires Gen Re to be liable for claims for which it retains premium. Therefore, Gen Re must pay reinsurance benefits to Lincoln pursuant to the Treaty for Lincoln insureds who died during a period covered by premium paid by Lincoln to Gen Re regardless of whether the death claims were paid by Lincoln before, on, or after April 1, 2014.

*Id.* at 3.  The Clarification also pointed to two relevant provisions of the Treaty.  *Id.* at 2-3.

First, the Clarification noted that Exhibit F of the Treaty provided, in relevant part, that Lincoln "will take credit, without interest, for any unearned premiums arising due to reductions, cancellations or death claims."   Clarification at 2; *see also* Treaty, Ex. F.  The Clarification noted that Exhibit F did not provide for credit of unearned premiums to Lincoln in the event of recapture, thus, when read in context of the Treaty, paragraph 6.b.i entitled Gen Re to retain the unearned premiums it held as of the day of recapture.  Clarification at 2.

Second, the Clarification pointed to Section 4.1 of the Treaty, which provided, in relevant part that:

> [General Re's] liability to [Lincoln] for the reinsurance due shall be based on the net amount of risk at the time of the Insured Individual death.  [General Re's] liability to [Lincoln] for the net amount at risk on a Policy that is reinsured shall be determined based on a ratio of [General Re's] liability to the total net amount at risk under the policy at the time the reinsurance is placed.  [General Re] shall share in any decrease in the net amount at risk in proportion to its share of the reinsurance on the Policy.

Clarification at 3.  The Clarification concluded that, when read in context of the treaty, paragraph 6.b.i required Gen Re to be liable for any claims for which it retained the premium.  *Id.*

The Clarification therefore ordered that General Re could keep all premiums paid to it before April 1, 2014, including the portions that represented unearned premiums, but that it also would be responsible for paying claims for all covered deaths, even if those deaths occurred on or after April 1, 2014.  Under the Clarification, General Re would also have to continue to accept and pay new claims arising on or after April 1, 2014, if the premium covering the date of death had been paid to General Re before that date.  The Final Award as clarified requires that General Re make an additional recapture payment to Lincoln of around $17 million to $18 million.  *See* Gen Re Br. at 11, ECF No. 7; Lincoln Br. at 6, ECF No. 22-7

General Re filed the Petition to confirm the original Final Award with this Court on December 22, 2015, ECF No. 1, and Lincoln filed the Cross-Petition to confirm the Clarification on January 19, 2016.  ECF No. 21.  Lincoln filed a Motion for Judgment on April 25, 2016, requesting that the Court confirm the Clarification.  ECF No. 46.  The Court held a hearing on the matter on June 28, 2016.  ECF No. 55.

## II.     STANDARD OF REVIEW

The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA") "provides the exclusive, and

limited, authority for federal court review of an arbitral award."  *Arrowood Indem. Co. v.*

*Trustmark Ins. Co.*, 938 F. Supp. 2d 267, 272 (D. Conn. 2013), *aff'd*, 560 F. App'x 75 (2d Cir.

2014) (citing *Hall St. Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008)).

> The FAA provides a streamlined process for a party seeking a judicial decree
> confirming an award, an order vacating it, or an order modifying or correcting it.
> Normally, confirmation of an arbitration award is a summary proceeding that
> merely makes what is already a final arbitration award a judgment of the court, and
> the court must grant the award unless the award is vacated, modified, or corrected.
> But arbitration awards are not self-enforcing.  Rather, they must be given force and
> effect by being converted to judicial orders by courts.

*R & Q Reinsurance Co. v. Utica Mut. Ins. Co.*, 18 F. Supp. 3d 389, 392 (S.D.N.Y. 2014)

(internal quotation marks omitted).  Section 10 of the FAA allows a district court to vacate an

arbitration award only in narrow circumstances including, in relevant part, "where the arbitrators

exceeded their powers."  9 U.S.C. § 10(a)(4).

Furthermore, "[r]eview of an arbitral award by a district court is severely limited so as

not unduly to frustrate the goals of arbitration – namely to settle disputes efficiently and avoid

long and expensive litigation."  *R & Q Reinsurance*, 18 F. Supp. 3d at 392 (quotation marks

omitted).  Accordingly, the Second Circuit "has repeatedly recognized the strong deference

appropriately due arbitral awards and the arbitral process, and has limited its review of

arbitration awards in obeisance to that process."  *Porzig v. Dresdner, Kleinwort, Benson, N. Am.*

*LLC*, 497 F.3d 133, 138 (2d Cir. 2007).  Courts "encourage and support the use of arbitration by

consenting parties" and "use[] an extremely deferential standard of review for arbitral awards."

*Id.* at 138-39.

The Second Circuit has therefore recognized that the "intent of a panel of arbitrators should not be frustrated merely because," for example, "its members may have misinterpreted the law." *Americas Ins. Co. v. Seagull Compania Naviera, S.A.*, 774 F.2d 64, 66-67 (2d Cir. 1985).  Thus, whenever an arbitration award is "indefinite, incomplete, or ambiguous," a court should remand the award to the arbitrators, "so that the court will know exactly what it is being asked to enforce." *Rich v. Spartis*, 516 F.3d 75, 83 (2d Cir. 2008) (citing *Ottley v. Schwartzberg*, 819 F.2d 373 (2d Cir.1987)).  Other courts also recognize that remand to the arbitrators for clarification of an ambiguous award "is consistent with the policy of judicial restraint that is the thrust of federal arbitral jurisprudence because it gives the arbitrator the opportunity to clarify an award with respect to which an ambiguity has arisen rather than forcing the court to interpolate its own estimate of the arbitrator's intent." *Office & Prof'l Employees Int'l Union, Local No. 471 v. Brownsville Gen. Hosp.*, 186 F.3d 326, 332 (3d Cir. 1999).  "Such a remand avoids the court's misinterpretation of the award and is therefore more likely to give the parties the award for which they bargained." *Id.*

The Second Circuit has, therefore, vacated a district court order that confirmed an arbitration award in a way that "effect[ed] a setoff [from a separate arbitration award] that may not have been intended by the arbitrators," where the underlying award was unclear as to whether the arbitrators intended for there to be a setoff.  *Americas Ins.*, 774 F.2d at 66.  Instead, the Second Circuit required the district court to remand the award to the arbitrators for clarification.  *Id.* (noting that "[n]o provision was made for setoff or net recovery" in the award at issue which was unusual because "where marine arbitrators are asked to adjust crossclaims, it is extremely rare for them not to combine the claims and reduce them to one award" which the district court then did on its own).

Similarly, courts often defer to an arbitrator's interpretation that an original award as ambiguous and in need of clarification. *See Marine Office, Inc. v. Transfercom Ltd.*, No. 08-CIV-10367 (PGG), 2009 WL 1025965, at *3 (S.D.N.Y. Apr. 15, 2009) ("[I]f the panel believed that this issue was one that could be resolved through a 'clarification' of an ambiguity in the Final Award, it would not have been barred from reconsideration by the *functus officio* doctrine."); *Clarendon Nat. Ins. Co. v. TIG Reinsurance Co.*, 183 F.R.D. 112, 117 (S.D.N.Y. 1998) (taking into account that "that the arbitrators acknowledged a mathematical error" as an "equitable factor[]" weighing in favor of finding arbitrators' clarification proper).

Despite the "strong deference" that courts generally accord to arbitrators and arbitration awards, *Porzig*, 497 F.3d at 138, the scope of arbitrators' powers is also circumscribed in that, "[o]nce arbitrators have finally decided the submitted issues, they are, in common-law parlance, '*functus officio*,' meaning that their authority over those questions is ended." *Trade & Transp., Inc. v. Nat. Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991).  Consequently, arbitrators are generally not permitted, absent an agreement by the parties to the contrary, to reconsider their adjudication of an issue. *See, e.g.*, *id.*; *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 342-43 (2d Cir. 2010).

 "The policy underlying [the doctrine of *functus officio*] is an unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a final decision which he has already rendered, because of the potential evil of outside communication and unilateral influence which might affect a new conclusion." *Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 331-32 (3d Cir. 1991).

## II.    DISCUSSION

In this case, which presents a challenging question of law and involves significant financial stakes[6], the confirmation of the arbitrators' award, as clarified, is warranted.

The relevant provision of the Final Award may have appeared to provide clear guidance on the parties' obligations, if Lincoln elected to recapture, that "[a]ll premium and claim transactions paid by one party to the other" after April 1, 2014 "shall be unwound."  Final Award ¶ 6.b.i.  Nevertheless, the parties interpreted the Final Award in dramatically different ways and, upon the parties' submission of the dispute to the arbitrators, the arbitrators found "ambiguities requiring clarification" in the award and presented a third interpretation of the recapture provision that was "contrary to the interpretations of [both of] the parties."  Clarification at 2.

As a result, consistent with the applicable law, confirming this award as clarified defers to the arbitrators, whose authority was properly exercised to address an ambiguity in the Final Award and avoids a consequence significantly at odds with the underlying agreement between the parties, the Treaty.

Courts continue to be unanimous in recognizing and applying the doctrine of *functus officio*[7].  Courts also "recognize[] several exceptions" to the doctrine "that permit an arbitrator to reconsider an award, even if the doctrine of *functus officio* applies."  *Employers' Surplus Lines Ins. Co. v. Glob. Reinsurance Corp.-U.S. Branch*, No. 07-CIV-2521 (HB), 2008 WL 337317, at *4 (S.D.N.Y. Feb. 6, 2008) (citing *Hyle v. Doctor's Assocs., Inc.*, 198 F.3d 368, 370 (2d Cir.

---

[6] *See* Lincoln Br. at 6 ("Gen Re's Brief states that Gen Re calculates the effect of the Clarification as requiring an additional recapture payment to Lincoln of $17 million.  Lincoln calculates the additional amount due as more than $18 million.").  The Court also notes that, while the amount at stake is substantial, this dispute and the underlying arbitration proceedings concerned only a portion of the business between General Re and Lincoln.  *See* Gen Re Pre-Hearing Br. at 4 ("Gen Re has a substantial and longstanding business relationship with Lincoln. . . . There are numerous treaties between the parties, including YRT and coinsurance agreements covering term and permanent life products, as well as disability and long term care products.")
[7] The Court can identify no precedent where any court allowed arbitrators to amend an original final arbitration award without first identifying an exception to the *functus officio* doctrine.

12

1999)).  In addition to an agreement by the parties to allow the arbitrators to revisit an award,

there are three commonly recognized exceptions to the doctrine of *functus officio*: "(1) an

arbitrator can correct a mistake which is apparent on the face of his award; (2) where the award

does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has not

exhausted his function and it remains open to him for subsequent determination; and (3) where

the award, although seemingly complete, leaves doubt whether the submission has been fully

executed, an ambiguity arises which the arbitrator is entitled to clarify."  *Colonial Penn*, 943

F.2d at 332 (internal quotation marks omitted); *see also Clarendon*, 183 F.R.D. at 116.

Under the three exceptions to the *functus officio* doctrine, the arbitrators' clarification or

correction must not modify or alter the original award.  *See Kennecott Utah Copper Corp. v.

Becker*, 186 F.3d 1261, 1272 (10th Cir. 1999) ("[Plaintiff] has thus failed to demonstrate that the

letter augmented or altered the award in any way. . . .  The letter thus fell within the clarification

and/or completion exceptions to the *functus officio* doctrine."); *Glass, Molders, Pottery, Plastics

& Allied Workers Int'l Union, AFL-CIO, CLC, Local 182B v. Excelsior Foundry Co.*, 56 F.3d

844, 847 (7th Cir. 1995) ("*Glass Molders*") ("These questions . . . can fairly be characterized as

'interpretive,' allowing the [plaintiffs] to crawl through the loophole in the doctrine of *functus

officio* for clarification or completion, as distinct from alteration, of the arbitral award.").

Instead, the arbitrators should only clarify the meaning of the award.  *See Waveform Telemedia,

Inc. v. Panorama Weather N. Am.*, No. 06-CIV-5270 (CM) (MDF), 2007 WL 678731, at *8

(S.D.N.Y. Mar. 2, 2007) (approving of clarification where "the modification made by [the

arbitrator] did not modify the spirit and basic effect of the award" (internal quotation marks

omitted)); *All Seasons Servs., Inc. v. Guildner*, 94 Conn. App. 1, 11 (2006) (approving of

clarification because "[c]ontrary to the defendant's contention, the arbitrator's letter did not modify any substantive content of the original award, but merely explained its meaning").

Lincoln does not argue that the Final Award contained "a mistake which is apparent on the face" of the award, *Colonial Penn*, 943 F.2d at 332, nor that the Final Award did not adjudicate the issue of recapture, which had been submitted to the arbitrators.  Lincoln Br. at 1-2. Instead, Lincoln argues that the Final Award contained an ambiguity that required clarification. *Id.*

An arbitrators' clarification of an ambiguity within an original award "is not within the policy which forbids an arbitrator to redetermine an issue which he has already decided, for there is no opportunity for redetermination on the merits of what has already been decided."  *La Vale Plaza, Inc. v. R. S. Noonan, Inc.*, 378 F.2d 569, 573 (3d Cir. 1967).  "Instead, the clarification of an ambiguity closely resembles the correction of a mistake apparent on the face of the award and the determination of an issue which the arbitrators had failed to decide."  *Id.* (ordering arbitrator to clarify award in order "to remove the cloud of doubt as to whether they considered the payment of $56,429.66 [made during the pendency of the arbitration proceedings] in making their award" of $30,861.64 and noting that this would "in no way reopen the merits of the controversy").  Arbitrators must be allowed to clarify such ambiguities "so that the court will know exactly what it is being asked to enforce" when parties ask for judicial enforcement of the award. *Americas Ins.*, 774 F.2d at 67.

The provision of the original Final Award at issue, paragraph 6.b.i, orders that "[a]ll premium and claim transactions paid by one party to the other . . . from April 1, 2014" are to be refunded.  Final Award ¶ 6.b.i.  The Clarification indicated that the panel believed that "the [Final Award] contain[ed] ambiguities requiring clarification," in part because both parties

interpreted paragraph 6.b.i "in a way that is inconsistent with the language of the Treaty," such that clarification "for the parties and any court of competent jurisdiction . . . to be able to discern how to enforce effectuate and calculate the economics of the Award" was required.  Clarification at 1.  The Clarification provided, in relevant part, that "[w]hen read in the context of recapture under the Treaty, paragraph 6.b.i only deals with prospective unwinding of premiums and claims transactions beginning April 1, 2014," and "when read in context of the Treaty, Paragraph 6.b.i entitles Gen Re to retain the unearned premium it held as of the date of recapture."  *Id.* at 2.  The Clarification also concluded that, when read in context of the Treaty, paragraph 6.b.i required Gen Re to be liable for any claims for which it retained the premium.  *Id.*

General Re and Lincoln's original positions regarding the Final Award's implications and the Final Award as clarified present three different interpretations of how recapture should proceed:

- General Re's position, beginning from the first discussions it had with Lincoln following the arbitrators' issuance of the Final Award, has been that the Final Award "revers[es] all cash transactions" between General Re and Lincoln occurring after the April 1, 2014 effective date of recapture.  *See* Recapture E-Mails at 6; Gen Re Br. at 1-2.
- Lincoln's position, prior to requesting clarification from the arbitrators, was that the recapture should effectively end the reinsurance arrangement covered by the treaty as of April 1, 2014, which required, in most relevant part, that General Re return premiums that had been paid to it before that date but that remained "unearned" because they covered a later period, but also meant that General Re would not be liable for any claims arising after April 1, 2014.  *See* Recapture E-Mails at 4, 7.
- The Final Award as clarified provides that General Re shall "retain the unearned premiums" that it "held as of" April 1, 2014, but that General Re must also "pay reinsurance benefits to Lincoln" for any "insureds who died during a period covered by premium paid by Lincoln to Gen Re" and that General Re was retaining.  Clarification at 1-2.  Thus, General Re would remain liable for certain "death claims [that] were paid by Lincoln before, on, or after April 1, 2014," the effective date of recapture.  *Id.* at 2.

 The Clarification also provided two examples illustrating the arbitrators' interpretations of the Final Award as clarified.  *Id.* at 2.

Consistent with the law discussed above, the Clarification must meet two requirements to survive vacatur.  First, in order for the arbitrators to have had authority to issue the Clarification, this provision of the Final Award must be found to have been ambiguous.  Second, the Clarification must merely clarify the ambiguity and not substantively change the Final Award. Because the Court finds that the Final Award was ambiguous and that the Clarification properly clarified the ambiguity, General Re's Petition to confirm the Final Award is denied, Lincoln's Cross-Petition to confirm the Clarification is granted, and Lincoln's Motion to enter judgment in accordance with the Clarification is granted. As a preliminary matter, however, the Court will first address two procedural issues: (1) whether Lincoln properly raised the issue of the recapture methodology in arbitration such that Lincoln may raise the issue before the Court now; and (2) whether the Clarification was timely issued.

### A.    Preliminary Issues

#### 1.    The Timeliness of Lincoln's Objections

General Re argues, in part, that Lincoln failed to raise arguments objecting to General Re's proposed recapture methodology until after the arbitrators issued the Final Award[8].  *See* Gen Re Conf. Br. at 8-9, ECF No. 7 ("Lincoln supported this purported 'clarification' with new arguments that it could have made in the arbitration – but for its own strategic reasons opted not to.").  "Failure to raise an issue in an arbitration proceeding waives the issue in a confirmation or enforcement proceeding." *Am. Nursing Home v. Local 144 Hotel, Hosp., Nursing Home & Allied Servs. Union, SEIU, AFL-CIO*, No. 89-CIV-1704 (DNE), 1992 WL 47553, at *4 (S.D.N.Y. Mar. 4, 1992); *see also United Food & Commercial Workers Local 100A v. John Hofmeister & Son, Inc.*, 950 F.2d 1340, 1343-45 (7th Cir. 1991) ("Failure to present the issue

---

[8] General Re raises this issue as part of its discussion of the "Factual Background" of this case, rather than as part of its "Argument."  *See* Gen Re Br. at 8-9.

and evidence below before the arbitrator waives the issue in an enforcement proceeding."
(internal quotation marks omitted)).

The Courts finds that Lincoln did, however, raise arguments objecting to General Re's
proposed recapture methodology before the arbitration panel, both (1) prior to the hearing and
the arbitrators' issuance of the Final Award and (2) prior to the arbitrators' issuance of the
Clarified Award.  Specifically, Lincoln's pre-hearing brief discussed recapture to the extent of
arguing that "no provision in the Treaty . . . requires notice within 30 days" if Lincoln exercises
its right to recapture and that "no provision in the Treaty . . . imposes the conditions on recapture
that Gen Re requests the Panel declare," objecting to the recapture methodology that General Re
proposed.  Lincoln Pre-Hearing Br. at 21.  When requesting the Clarification, Lincoln also
explained its position regarding the methodology for calculating recapture payments to the
arbitrators.  *See generally* 10/26/2015 Letter.  Because Lincoln raised arguments regarding the
recapture methodology "in [the] arbitration proceeding," Lincoln may now raise these issues
again in the "confirmation or enforcement proceeding."  *Am. Nursing Home*, 1992 WL 47553 at
*4.  The Court therefore finds that Lincoln has not waived arguments opposing General Re's
proposed recapture methodology in this proceeding.

### 2. The Timeliness of the Arbitrators' Clarification

General Re also argues, in part, that the arbitrators failed to issue the Clarification within
a reasonable period of time, and that the Court should therefore reject the Clarification.  *See* Gen
Re Br. at 19-20.  Courts generally recognize that "the power of arbitrators to clarify an award
already made must be exercised within a reasonable period of time."  *Glass Molders*, 56 F.3d at
848 (finding that "[a]ll things considered, we cannot say that . . . 85 days after the rendition of
the initial award" was "too late for the arbitrator to be entitled to clarify the award"); *see also*

*Employers Ins. of Wausau v. El Banco De Seguros Del Estado*, 357 F.3d 666, 670 (7th Cir. 2004) (holding that eight years after the arbitration award was issued was too late for a party to seek clarification); *Arrowood*, 938 F. Supp. 2d at 269 (noting that a case initiated with a 2003 petition to confirm an arbitration award had "transmogrified over the years to become the antithesis of the speedy, inexpensive dispute resolution process" that arbitration should be and rejecting the arbitrators' 2010 clarification following remand for clarification from the district court).

The arbitrators issued the Final Award on July 1, 2015. Lincoln did not formally notify General Re that it would invoke its right to recapture until September 28, 2015. The record shows that Lincoln and General Re had been discussing recapture methodology through various e-mails beginning on or around September 18, 2015. *See* Recapture E-mails. It was only on October 13, 2015, that General Re sent Lincoln a letter indicating it would remit payment to Lincoln only for the $5,484,107 General Re believed it owed under its interpretation of the recapture methodology in the Final award. *See* 10/13/2015 Letter. Lincoln then accepted that wire transfer on October 15, 2015. On October 26, 2015, thirteen days after General Re's letter and eleven days after receiving the wire transfer, Lincoln sent a letter to the arbitrators asking them to resolve the dispute about the recapture methodology on October 26, 2015. *See* 10/26/2015 Letter.

In light of this timeline, where Lincoln only formally notified General Re that it would invoke its right to recapture on September 28, 2015, and where the discussion between the parties regarding their disagreement about the recapture method and calculations was ongoing until October 13, 2015, the Court finds that Lincoln requested the clarification within a reasonable amount of time. *See Glass Molders*, 56 F.3d at 848 (finding 85-day delay in seeking

clarification reasonable where labor arbitration award provided sixty-day deadline for employee to complete rehabilitation program but programs took nearly thirty days to complete and parties took several weeks to negotiate which should pay the cost of the program).

### B. The Ambiguity of the Final Award

The arbitrators found the Final Award to be ambiguous and warranted a clarification because the parties' interpretation of paragraph 6.b.i. of the Final Award, as written, conflicted with section 4.1 of the Treaty.  No Second Circuit case has yet to analyze whether an arbitration award is ambiguous, such that the arbitrator may clarify the award under an exception to the *functus officio* doctrine.  The Second Circuit, has, however, repeatedly discussed whether arbitration awards are ambiguous, such that a court may not enforce the award but should, instead, remand the award to the arbitrators for their clarification.  *See N.Y. Bus Tours, Inc. v. Kheel*, 864 F.2d 9, 12 (2d Cir. 1988) ("When an arbitration award provides no clear instruction as to how a court asked to enforce the award should proceed, the court should remand to the arbitrator for guidance."); *Americas Ins.*, 774 F.2d at 67 ("Although judicial review of an arbitration award is very narrowly limited, a court should not attempt to enforce an award that is ambiguous or indefinite." (internal citations omitted)).  Courts in the Second Circuit have found ambiguity in arbitration awards for reasons including that: "the award seem[ed] contradictory on its face"[9]; the award "failed to deal explicitly with the contingency which arose"[10]; in a case involving multiple defendants, the award did not clearly indicate the identity of the party against whom the arbitrator ordered relief[11]; the award gave no indication whether plaintiff would be

---

[9] *Bell Aerospace Co. Div. of Textron v. Local 516, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 500 F.2d 921, 923-24 (2d Cir. 1974).
[10] *Olympia & York Florida Equity Corp. v. Gould*, 776 F.2d 42, 45 (2d Cir. 1985).
[11] *Hyle v. Doctor's Associates, Inc.*, 198 F.3d 368, 371 (2d Cir. 1999).

awarded or denied the additional compensation sought[12]; the award failed to address whether reinstatement to "former position" meant that a school bus driver must be given same route as before[13]; and the award was based on a mathematical error in calculating damages.[14]

Courts often find ambiguity in an arbitration award "when the award fails to address a contingency that later arises" or "when the award is susceptible to more than one interpretation." *Hartford Steam Boiler Inspection & Ins. Co. v. Underwriters at Lloyd's & Companies Collective*, 271 Conn. 474, 489-90 (2004). An arbitration awards' use of terms subject to multiple interpretations without further explanation or definition may also render an award ambiguous. *See York Research Corp. v. Landgarten*, 927 F.2d 119, 123 (2d Cir. 1991) ("We are unable to determine whether the arbitrators intended the word 'expenses' to include attorneys' fees. For this reason, we remand that portion of the case to the district court with instructions to seek clarification from the arbitrators.").

The ambiguity identified here by the arbitrators and acted upon by the Clarification is consistent with this body of case law. The fact that the arbitrators did not provide any accompanying reasons for their award, as with the recapture methodology ordered in the Final Award in this case, "will not render the award ambiguous" because "[a]rbitrators need not give reasons for their determinations." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 112 (2d Cir. 1993); *but see Green v. Ameritech Corp.*, 200 F.3d 967, 977-78 (6th Cir. 2000) (noting that "a failure fully to explain an award" may "authorize a remand based on" the clarification of ambiguity exception to the *functus officio* doctrine because "[t]he purpose of this exception is to

---

[12] *Refino v. Feuer Transp., Inc.*, 480 F. Supp. 562, 565 (S.D.N.Y. 1979), *aff'd* 633 F.2d 205 (2d Cir. 1980).
[13] *Local 1336, Amalgamated Transit Union, AFL-CIO v. First Student, Inc.*, No. 3:11-cv-1463, 2013 U.S. Dist. LEXIS 23604, *7-8, 2013 WL 646265, *3 (D. Conn. Feb. 21, 2013).
[14] *Waveform Telemedia, Inc. v. Panorama Weather N. Am.*, No. 06-cv-5270, 2007 U.S. Dist. LEXIS 15626, 2007 WL 678731, *8 (S.D.N.Y. Mar. 2, 2007).

permit the arbitrator to complete an assigned task" and remand for clarification " would not implicate any of the concerns underlying the *functus officio* doctrine, as [the arbitrator] would simply be completing his duties by clarifying his reasoning, not reopening the merits of the case").

An ambiguity in an arbitration award "may be shown not only from the face of the award but [also] from an extraneous but objectively ascertainable fact." *Colonial Penn*, 943 F.2d at 334 (discussing ambiguities in an arbitration award that warrant remand from the court to the arbitrator "for clarification of the intended meaning" of the award); *see also Hyle*, 198 F.3d at 371-72 ("We think the wording of the award, read in conjunction with the undisputed limitation announced by [Doctor's Associates, Inc.] as to the respondent against whom it was seeking damages and an injunction, creates an ambiguity as to whether the arbitrator intended to award damages and an injunction against Gruelich, Hyle, or possibly even all four respondents.")

The parties' inability to agree as to the meaning of the original arbitration award supports a court's finding that the original award is ambiguous. *See Local 2322, Int'l Bhd. of Elec. Workers v. Verizon, Inc.*, No. CIV.A. 04-12490-RWZ, 2005 WL 3160696, at *3 (D. Mass. Nov. 23, 2005) (noting that "[p]erhaps most telling is the parties' differing interpretations of the award and their inability to resolve their differences" when finding that the arbitrators properly interpreted an ambiguous award); *All Seasons Servs.*, 94 Conn. App. at 13 ("The defendant's argument that the court misconstrued the award implies that an ambiguity existed in the award's language that needed to be resolved.").

Similarly, to the extent that the arbitrators believe that an award is ambiguous and requires clarification, this also supports a court's finding that the original award was ambiguous and that the arbitrators' clarification is proper. *See Marine Office*, 2009 WL 1025965 at *3 ("[I]f

the panel believed that this issue was one that could be resolved through a 'clarification' of an ambiguity in the Final Award, it would not have been barred from reconsideration by the *functus officio* doctrine."); *Clarendon*, 183 F.R.D. at 117 (taking into account that "that the arbitrators acknowledged a mathematical error, one that neither party disputes" as an "equitable factor[]" weighing in favor of confirming the clarified award); *see also AP Seating USA, LLC v. Circuit of the Americas LLC*, No. A-14-CA-058-SS, 2014 WL 3420805, at *3 (W.D. Tex. July 10, 2014) (noting that "[g]iven the extraordinary level of deference afforded to arbitration awards, a majority opinion declaring certain language in an award to be a clerical error must be upheld over the voice of a lone dissenter" while approving of clarification to arbitration award).

Although the key provision of the Final Award, providing that "[a]ll premium transactions paid by one party to the other following the effective date of the recapture . . . shall be unwound," Final Award ¶ 6.b.i.[15], may appear clearly written, it is ambiguous when read in the context of the larger dispute between Lincoln and General Re and the "objectively ascertainable fact" of the Treaty between them, *Colonial Penn*, 943 F.2d at 334.  As the Clarification pointed out, section 4.1 of the Treaty provided that "[General Re's] liability to [Lincoln] for the reinsurance due shall be based on the net amount of risk at the time of the Insured Individual death" and that "[General Re's] liability to [Lincoln] for the net amount at risk on a Policy that is reinsured shall be determined based on a ratio of [General Re's] liability to the total net amount at risk under the policy."  Clarification at 3.

The Second Circuit, in *Hyle*, has found that a facially clear award that awarded relief to a party against whom relief was not actually requested could still be ambiguous because the larger

---

[15] General Re's brief cited numerous cases in support of the proposition that the key term of paragraph 6.b.i. of the Final Award, "paid", is unambiguous.  *See* General Re Br. at 16-17, 16 n. 11.  The Court notes that all of General Re's cited cases appear to discuss statutory interpretation, not the interpretation of arbitration awards.

context of the arbitration proceedings "create[d] an ambiguity" as to which party the arbitrator intended to award the relief against. *Hyle*, 198 F.3d at 371-72.  The Court finds that the Final Award was ambiguous in the context of the Treaty because of the potential contradiction between paragraph 6.b.i. of the Final Award, as written, and section 4.1 of the Treaty.  This ambiguity allowed the arbitrators to issue a clarification of the Final Award so long as the clarification "did not modify the spirit and basic effect of the award." *Waveform Telemedia*, 2007 WL 678731 at *8.

Furthermore, the three different interpretations of paragraph 6.b.i. of the Final Award that have been presented by General Re, Lincoln, and the arbitrators support the Court's conclusion that the Final Award was ambiguous and that the arbitrators could properly issue a clarification. In light of the "strong deference" that courts give to "the arbitral process," *Porzig*, 497 F.3d at 138, the Court finds that it is particularly important to defer to the arbitrators' conclusion that there was an ambiguity in the Final Award that required the Clarification.  *See* Clarification at 1.

 Courts in this Circuit have acknowledged that, if the arbitrators "believed that this issue was one that could be resolved through a 'clarification' of an ambiguity in the" original award, the arbitrators are not barred "by the *functus officio* doctrine." *Marine Office*, 2009 WL 1025965 at *3.  The fact that Lincoln and General Re both advanced dramatically different interpretations of paragraph 6.b.i of the Final Award, which the arbitrators then rejected in the Clarification, lends further credence to the arbitrators' interpretation of the award as ambiguous and subject to multiple interpretations.  *See Local 2322*, 2005 WL 3160696 at *3.

## C.    The Clarification and its Consistency with the Final Award

A valid clarification of an arbitration award under *functus officio* doctrine must be consistent with the original award and should not modify "[t]he spirit and basic effect of the

23

award." *Clarendon*, 183 F.R.D. at 116 (noting that arbitrators "simply made a mathematical error they now seek to correct" and that "[t]he spirit and basic effect of the award was not modified" by this correction, allowing the clarified award to be enforced); *All Seasons*, 94 Conn. App. at 11-12 ("Contrary to the defendant's contention, the arbitrator's letter did not modify any substantive content of the original award, but merely explained its meaning. . . . The court's decision to disregard the clarification . . . was improper." (internal quotation marks omitted)).  As discussed below, an analysis of cases where courts have approved of arbitrators' clarifications under the exceptions to the *functus officio* doctrine, or where courts found original awards ambiguous, show that proper clarifications can appear to change significantly the relief awarded, as is the case here.

Courts in this Circuit have found that proper clarifications of awards under the exceptions to *functus officio* doctrine may still appear to modify the original award or its implications in order to make the award consistent with the arbitrators' original intent.  Because proper clarifications may involve the correction of a math error, for instance, a proper clarification may change the awarded amount because such a correction "d[oes] not modify the spirit and basic effect of the award," but simply "ma[kes] it consistent with the arbitrators' intent" and "maintain[s] the underlying resolution of the dispute," in that case, to "award [Party A] consequential damages for [Party B's] breach of the contract, offset by [Party A's ] preexisting expenses."  *See Waveform Telemedia*, 2007 WL 678731 at *8 (subtracting additional $72,000 from award given to Party A which arbitrators previously omitted to).  In a case where the district court had remanded the award to the arbitrators on other issues, but not on damages, a court nonetheless still approved the arbitrators' clarification to correct a math error.  *See Clarendon*, 183 F.R.D. at 116-17 (approving of clarification because "arbitrators made and

24

acknowledged a mistake" and finding that because "the arbitrators acknowledged a mathematical error" undisputed by the parties the "equitable factors" weighed in favor of allowing the clarification).

Courts in other circuits have also allowed clarifications that appeared to modify the implications of the original award under the exceptions to the *functus officio* rule.  For instance, a proper clarification may add to the relief that the arbitrator originally awarded, and therefore "complete[] the award."  *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, Local 631 v. Silver State Disposal Serv., Inc.*, 109 F.3d 1409, 1411 (9th Cir. 1997) ("In this case, the arbitrator's clarification was permissible because it completed the award. The arbitrator explained that she had intended to award back pay, but had failed to address the issue. [Defendant] offered no evidence to refute the arbitrator's explanation of her state of mind at the time she executed the initial award."); *see also Kennecott Utah*, 186 F.3d at 1272 (finding that clarification that clarified that arbitrator did not award backpay "fell within the clarification and/or completion exceptions to the *functus officio* doctrine").

Some courts have also found that arbitrators have the power to "properly go back and clarify any inconsistencies of interpretation" of the original award so as to clarify "an award subject to multiple interpretations."   *See Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local No. 24*, 357 F.3d 546, 556 (6th Cir. 2004) (discussing case where arbitrators clarified proper calculation of back pay compensation after parties disagreed as to the calculations under original award).

An analysis of cases where courts find that an arbitration award was ambiguous and required remand to the arbitrators further shows that clarifications by arbitrators can define or redefine terms in the awards and therefore appear to change the liabilities between the parties.

*See York Research*, 927 F.2d at 123 (remanding ambiguous award to arbitrators to clarify whether awarding of "expenses" in the award included attorneys' fees); *Seton Co. v. Lohmann GmbH & Co.*, No. 90-CIV-1312 (CSH), 1992 WL 80637, at *7 (S.D.N.Y. Apr. 9, 1992) ("In the case at bar, I think it is not only desirable but necessary to know the factors to be included in the PP component of the governing calculations. . . . Accordingly the arbitrators must clarify their intended calculations underlying the award, so that the Court may enter a proper judgment."). As one circuit court has permitted, remand for such clarification could change a seemingly clear provision of an original award that had provided for the "release of a claim which never existed." *See Colonial Penn*, 943 F.2d at 335 (allowing district court to remand original award to arbitrators where it provided in part that Party A "shall further release any and all claims to the reserves" held by Party B but Party B was not actually holding such reserves which amounted to an ambiguity).

A court in this District has found that arbitrators were "without authority" to clarify an award by further explaining the terms in the original award referring to "ultimate responsibility" of one party to another and what a party's "best faith efforts" required, which impermissibly "altered its finding of [Party A's] non-obligations to [Party B] by setting out new means by which [Party A] would become liable to [Party B]. *Arrowood*, 938 F. Supp. 2d at 273-74.

That case, however, differed from this one because the Clarification did not "set[] out new means" by which General Re "would become liable to" Lincoln. *Arrowood*, 938 F. Supp. 2d at 273-74. Instead, the Clarification explained what the arbitrators meant in the Final Award when it provided that "[a]ll premium and claim transactions paid by one party to the other following the effective date of the recapture . . . shall be unwound" if Lincoln elected to recapture. Final Award ¶ 6.b.i. The Clarification clarified that the Final Award's recapture

provision should be "read in context of the Treaty," allowing General Re to retain the unearned premium it held as of the date of recapture, but also requiring it to "be liable for claims for which it retain[ed] premium" and to "pay reinsurance benefits to Lincoln . . . for Lincoln insureds who died during a period covered by premium paid by Lincoln to Gen Re regardless of" when the death claims were paid.  Clarification at 3.

The Clarification therefore explains what the arbitrators intended with respect to the relief awarded in the Final Award, maintaining the "spirit and basic effect" of the Final Award. *Clarendon*, 183 F.R.D. at 116.  That the Clarification resulted in $17 million or more in additional liability from General Re to Lincoln does not inherently prevent the Clarification from being "consistent with the arbitrators' intent" and "maintain[ing] the underlying resolution of the dispute."  *See Waveform Telemedia*, 2007 WL 678731 at *8 (approving of clarification that subtracted $72,000 from an award).

Significantly, the dispute that led the parties to seek arbitration did not center on recapture or recapture methodologies.  Instead, the central question was whether General Re had properly exercised its right to increase the reinsurance rates, which required that the rate increase be based solely on a change in anticipated mortality.  *See generally* Full Hearing Trans. (discussing recapture methodology only on pages 1248 to 1248 and 1255 to 1256).  Lincoln's original position was that General Re's rate increase was improper and that, therefore, there was no need to reach the issue of recapture because Lincoln would only be entitled to recapture if the rate increase was, in fact, proper.  *See* Treaty, Ex. C-1, ¶ 7.  Lincoln's pre-hearing brief and presentation at the arbitration discussed recapture, but only to argue that the Treaty did not require Lincoln to give notice that it was exercising its right to recapture within 30 days and that "no provision in the Treaty . . . imposes the conditions on recapture that Gen Re requests the

Panel declare."  Lincoln Pre-Hearing Br. at 21.  Given Lincoln's position, its proposed final award did not contain any provisions about recapture.  *See* Lincoln Proposed Final Award.  The arbitrators took paragraph 6.b.i. of the Final Award from General Re's proposed final award. *See* Gen Re. Proposed Final Arbitration Award ¶ 6.b.i.

While General Re argues that Lincoln's failure to discuss recapture methodology extensively during the arbitration weighs in favor of the Clarification being a fundamental change to the award rather than a permissible clarification of the arbitrators' intent, Gen Re. Br. at 9, the Court finds that the lack of extensive discussion of recapture methodology during the initial arbitration also supports the inference that the Clarification properly clarified the arbitrators' original intent.  Because the arbitration hearing contained essentially no substantive discussion about what recapture would look like, the Court finds that the Final Award did not unambiguously reflect the arbitrators' intent as to the recapture methodology.  To the extent that the arbitrators describe the Clarification as being consistent with the Treaty and addressing "ambiguities requiring clarification" in the Final Award, Clarification at 1, the Court defers to the arbitrators' interpretation.  *See Clarendon*, 183 F.R.D. at 116-17 (noting that arbitrators acknowledgment of a math error was one factor supporting the clarification); *Marine Office*, 2009 WL 1025965 at *3 (finding that if arbitrators believed the issue could be "resolved through a 'clarification' of an ambiguity in the Final Award" the clarification would be proper under *functus officio* doctrine).

Furthermore, the Court notes that the vast majority of cases holding that a clarification was legitimate under an exception to *functus officio* doctrine were similar to this case in that the clarifications generally concerned relief that was awarded, rather than the substance of the underlying dispute that led the parties to seek arbitration.  *See, e.g.*, *Silver State Disposal*, 109

F.3d at 1411 (allowing clarification indicating that backpay was part of award in labor arbitration when initial award was unclear); *Waveform Telemedia*, 2007 WL 678731 at *8 (approving clarification correcting math error in awarded amount).

Because the Clarification addressed the relief available to the parties following the arbitrators' determination that General Re's rate increase was legitimate, the Court finds that the Clarification clarified an ambiguity in the Final Award without impermissibly modifying the "spirit and basic effect of the award." *Clarendon*, 183 F.R.D. at 116

## III.    CONCLUSION

For the foregoing reasons, General Re's Petition, ECF No. 1, is **DENIED**; Lincoln's Cross-Petition, ECF No. 21; ECF No. 22, is **GRANTED**; and (3) Lincoln's Motion to Enter Judgment, ECF No. 45; ECF No. 46, is **GRANTED**.  The Court confirms the Final Award as clarified.

The Clerk is directed to enter judgment accordingly and to close this case.

SO ORDERED at Bridgeport, Connecticut, this 31st day of March, 2017.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge